## Broadnax v. Cheraw & Salisbury R. R., Appellant.

*Ships and shipping—General average.*

A cargo cannot be subjected to general average for losses occasioned by the unseaworthy condition of the vessel, where such condition existed at the beginning of the voyage.

*Presumption of unseaworthiness—Evidence—Burden of proof.*

Where it is shown that, shortly after the commencement of a voyage, a vessel, without encountering any stress of weather or any unusual perils of the sea, became so leaky as to be obliged to put into a port of refuge for repairs, the presumption is that she was unseaworthy when she sailed.

*Evidence—Seaworthiness—Classification.*

In an action on a general average bond where the question at issue was the seaworthiness of the vessel at the beginning of the voyage, it is not improper to ask a witness whether the vessel had a classification of seven years, at the time she was built and classed "A No. 1."  The question might be answered so as to throw some light upon the history of the ves-sel and her condition when she sailed.   In such a case it is also proper to admit in evidence the certificate of classification.

*Failure to object to testimony—Review—Practice.*

Where the answer of a witness is not responsive to a question and no exception is taken to the answer, and the court is not requested to strike it off, it cannot be objected to after judgment and appeal to the Supreme Court.

*Assignment of error—Evidence—Practice.*

An assignment of error which does not set forth the evidence admitted under an objection to a question, is improper.

Argued April 3, 1893.   Appeal, No. 210, Jan. T., 1893, by defendant, from judgment of C. P. No. 4., Phila. Co., Dec. T., 1880, No. 8, on verdict for plaintiff, Jane Broadnax et al.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Foreign attachment in case on general average bond.  Before THAYER, P. J.   (Reported below in 1 Dist. R. 251; also on former writ in 109 Pa. 432.)

At the trial, the general average bond was given in evidence. It was as follows:

" Whereas, The schooner ' Mattie A. Hand,' of Philadelphia, whereof Joseph Hearon is master, having on board a cargo of merchandise, sailed from the port of Philadelphia, on or about the ninth day of January, A. D. 1880, bound for Charleston, S. C., and in prosecution of her said voyage on the twenty-first day of January, 1880, at 1 P. M., Phœnix Island Lighthouse bore N. E. four miles distant with the wind from the N. E. and a chopping sea on, which caused the vessel to labor heavily, when upon sounding the pumps found that she had sprung a leak at the rate of about one hundred strokes per hour, and which gradually increased to about four hundred strokes per hour, with the pumps kept going all the time in order to keep her free.   At 7 P. M. Chincoteague Lighthouse bore W. N. W., and as it was deemed unsafe to continue on the voyage, after due consideration bore up for Norfolk for the general benefit, where we finally arrived on the 23d, at 1.30 P. M.

" The said vessel after having proceeded on her voyage, and on the 12th of April, 1880, at 1 P. M., Cape Henry Lighthouse bore W., about eight miles distant, wind W. N. W., and under all sails and a chopping sea, she again sprung a leak at the rate of five hundred strokes per hour, which continued to increase, when finding it unsafe to continue on the voyage finally bore up at 2 P. M. and arrived back at Hampton Roads on the 13th inst., at 9 A. M.   On the 14th inst. she arrived at Norfolk at 6.30 P. M. for repairs.   The said vessel being now under the command of W. Nelson Jarvis, who is master and agent for all concerned.

" By which means certain losses and expenses have been incurred, and other expenses hereafter may be incurred in con-

sequence thereof, which (according to the usages of the port of
Charleston, S. C.) may constitute a general average to be ap-
portioned on the said vessel, her earnings as freight, and the cargo
on board ; or a special or particular average or charge upon
said vessel, cargo and freight separately. Now we subscribers,
being owners, shippers, consignees, agents or attorneys of own-
ers, shippers, or consignees of said vessel or cargo, or under-
writers on said vessel, cargo, or freight, do hereby, for ourselves,
our executors and administrators, and our principals, generally
and respectively, but not jointly, nor one for the other, cove-
nant and agree to and with each other, and also separately to
and with the said master and agent for all concerned in the
said vessel, cargo, and freight; that the loss and damage afore-
said, and such other incidental expenses thereon, as shall be
made to appear to be due from us, the subscribers to these
presents, or our principals either as owners, shippers or con-
signees of said vessel or cargo, or as underwriters upon said
vessel, cargo, or freight, shall be paid by us respectively, ac-
cording to our parts of shares in the said vessel, her earnings
as freight, and her said cargo or our interest therein or respon-
sibility therefor, that such losses and expenses be stated and
apportioned in accordance with the established laws and usages
of this state in similar cases, by Jno. R. Heriot, adjuster of ma-
rine losses, and that we will severally furnish them on request
with all reasonable information and accounts. And for the
true performance of all and singular the premises, we do sev-
erally hereby bind ourselves," etc.

Plaintiffs proved the execution of the bond and that the ad-
justment was made in accordance with the laws and usages of
the port of destination, and, the same being admitted by the
court, rested.

Defendant gave evidence to show that the vessel sprung a
leak under circumstances which would not cause such results
to a seaworthy vessel, among other evidence the following ex-
tract from the log-book:

" Wednesday, January 21st, 1880.—Comes in fine weather ;
light N. W. winds. At 6.30 A. M. got under way and proceeded
to sea, all sail set. At 8 A. M. off Hen and Chickens. Stowed
the anchor, set the watch and tried the pumps ; wind hailing
to North. At 1 P. M., Phœnix Island, bearing N. W. 4 miles

distant. Tried the pumps; found the vessel making some water, about one hundred strokes per hour. Middle part, light E. winds and clear weather. At 7 P. M., Chincoteague, bearing to N. W., 11 miles distant; found the leak increasing to about four hundred strokes per hour. Winds E., S. E.; threatening weather; sharp sea. Vessel rolling heavy. Bore up for Norfolk. Pumps kept going all the time. Crew employed. So ends this day."

Plaintiff offered evidence in rebuttal; among other evidence the depositions of the master of the vessel in part as follows: "I put to sea on the 21st of January, 1880. After getting to sea the wind canted around to the eastward about nine o'clock in the morning. It breezed up right away and thickened up and commenced a storm; there was a short chopping sea, and being kind of quartering on the vessel it made her roll pretty heavily. There was nothing at that time in the weather or in the condition of the vessel to give me any anxiety. I continued on my voyage, and at twelve o'clock noon that day I tried my pumps and found my vessel was making a little water. I think it was eight o'clock that night, or it might have been twelve o'clock that night—it has been so long now that I can't remember—that the wind canted to the southward and eastward, and the vessel began to increase making water. I went on my voyage until I got up as far as Chincoteague; I think I got to Chincoteague about eight or twelve o'clock that night. When I got to Chincoteague I found the vessel making about four hundred strokes an hour. We had been trying the pumps then right along since dark, and were paying particular attention to see whether she was leaking or was not leaking. The weather at this time was stormy, the wind easterly and every appearance of a gale of wind setting in."

Rulings on evidence, assigned for error, are recited in the opinion. The ninth assignment of error was the admission of an affirmative answer to a question similar to the question in the eighth assignment.

The court charged in part as follows:

"This is not a bond of such a binding character that it prevents the defendants from setting up any good and lawful defence which they may have to the payment of the money, but it is a bond or agreement which binds them absolutely to the

payment of their share of the loss, provided it was a proper case for general average, as between the owners and the consignees of the cargo. If it was a proper case for general average, the defendants are bound by this adjustment. This adjustment has not been impeached, and by the law of the sea anywhere throughout the world, this adjustment is binding upon all parties in interest, if made by a competent officer and if it is unimpeached for fraud or mistake.

" Therefore, if you should be of the opinion that this was a proper case for a general average to be made, you ought to find a verdict for the plaintiffs for the amount awarded by the adjuster, with lawful interest thereon.

" The important question in the case, therefore, is whether this was a proper case for a general average as between the owners and these defendants. The defendants allege that it was not a proper case for general average because the vessel, as they say, was unseaworthy at the commencement of her voyage, and that the necessity which arose to put into the port of Norfolk for the purpose of repairs arose, not from the perils of the sea, but from the unseaworthiness of the vessel before she began her voyage. If that position is well taken and is proved to your satisfaction, you are to find a verdict for the defendants. If it is not proved, you are to find a verdict for the plaintiffs.

" There is in all contracts relating to the carriage of goods by sea, in reference to which questions arise between the owners of the ship and the owners of the cargo, an implied contract that the vessel shall be seaworthy at the commencement of her voyage. This means that the vessel is competent to resist ordinary attacks of wind and waves, and is completely equipped and manned for the voyage with a sufficient crew and with sufficient means to sustain them, and with a captain or master of general good character and nautical skill. It is also an implied condition that the goods and the tackle of the ship, etc., shall be properly stowed. In order to be seaworthy the vessel must be sound, staunch and strong, competent to resist all ordinary action of the wind and waves, and to prosecute her voyage without damage to the cargo. A seaworthy vessel is such a vessel as is able to encounter, without serious damage, all the ordinary perils of the sea.

" The question in the case is whether the ' Mattie A. Hand ' was a vessel of this character when she commenced the voyage from Philadelphia to Charleston. If you find that she was, you ought to find a verdict for the plaintiffs. If you find that she was not, you ought to find a verdict for the defendants. If you find for the plaintiffs, you ought to find what is awarded them by the adjuster in the adjustment of the average, with interest.

" I have already told you that a general average fairly settled at the port of destination, according to the usage and law of the port, is binding and conclusive as to the items, as well as the apportionment thereof upon the various interests, if it was a proper case for general average.

" This vessel sailed from this port on a voyage to Charleston, the principal part of her lading consisted of railroad iron, of which she had some five or six hundred tons on board, consigned to the defendants in this case. Everything seems to have gone right on board until she had gotten outside the capes of the Delaware, when, from some cause or other, the ship began to leak, and the leak continued to increase, and finally it became so great that the captain considered it his duty to put into the port of Norfolk for repairs. He sailed into the port of Norfolk, where the ship underwent repairs. After the repairs were made the ship started on her voyage again, and she began to leak again after she got outside of the capes of Virginia. They returned again to Norfolk, had the leak stopped, then resumed their voyage, and arrived safely at Charleston, delivering the railroad iron consigned to the defendants, upon their giving the general average agreement to which I have referred.

" The time to which you are to look in ascertaining the seaworthiness of the vessel, and the time to which the implied agreement of seaworthiness to which I referred relates, is the time preceding the commencement of the voyage. If the ship is tight and strong and is seaworthy when she begins her voyage, and becomes unseaworthy afterwards from the perils of the sea, of course the claim of the owners to their general average is not affected by that fact, because the owners do not warrant the continued seaworthiness of a vessel against all weather and all the accidents of the sea. They fulfill their obligation completely if she is seaworthy when she begins her voyage,

and that is the point to which you are to look in this case.   If this vessel was seaworthy when she began her voyage from Philadelphia, you ought to find for the plaintiffs.   If she was not seaworthy when she commenced this voyage, you ought to find a verdict for the defendants."

" You will see from what I have said that the whole case turns upon the question whether this was a proper case for a general average to be made, and whether it was a case in which the expenses of these repairs to the ship ought properly to be charged upon all the parties in interest, ship, cargo and freight, or whether it was not a case for a general average.   That question depends upon the single central question of all, whether this vessel was seaworthy, in the sense in which I have defined a seaworthy vessel, when she left the port of Philadelphia.   If you find that for the plaintiffs, you ought to find a verdict for the plain⁺iffs.   If you find it for the defendants, you ought to find a verdict for the defendants."

Defendant's points were among others as follows :

" 4. That the signing and delivery of the average bond or agreement by the president of the company defendant and the adjustment of Mr. Heriot did not of themselves make out a case entitling the plaintiff to recover from the defendant.   *Answer:* To which I answer they do not make out a case unless the case was a case for average.   If the injury received by the vessel on her voyage was caused by the perils of the sea, and was not due to her unseaworthiness before she commenced her voyage, the plaintiff is entitled to a verdict for the proportion of the loss with which the defendant is charged in this adjustment, and with interest thereon.   By the maritime law of the world a general average fairly settled at the port of destination according to the usage and law of the port is binding and conclusive as to the items as well as the apportionment thereof on the various interests, provided it was a proper case for general average." [1]

" 5. That in order to make out a case against the defendant, the plaintiff must show not only the execution of the average bond or agreement, but also that the expenses were incurred and their amount, and that they were caused by the perils of the sea.   *Answer:* In answer to this point I have to say that the uncontradicted evidence is that the vessel became so leaky

after getting outside of the capes of the Delaware that she was obliged to be put into Norfolk for repairs, and that she was there repaired. The general average, which was settled and adjusted by the adjuster, agreed upon in the general average agreement at the port of destination, is conclusive of the items and the apportionment also on all the parties in interest, and there is no evidence in this case to impeach this adjustment of the general average." [2]

"6. That the plaintiffs, in their case in chief, having given no evidence that the expenses claimed for had been paid, and that they were such as constituted a general average claim against the defendant, the verdict must be for the defendant." Refused. [3]

"7. That the signing of the average agreement and the adjustment did not of themselves bind the defendant to pay the amount fixed thereby as its share of the expenses, and the plaintiffs, in order to recover, must make additional proof that the expenses had been paid, and that they constituted a proper claim as general average." Refused. [4]

"8. That upon the case as presented by plaintiffs in chief, they have not proved their claim, and the verdict should be for defendant." Refused. [5]

9. Request for binding instructions. Refused. [6]

Verdict and judgment for plaintiffs. Defendant appealed.

*Errors assigned* were (1–6) instructions, quoting them, (7–10) rulings on evidence, assignments 8 and 9 not quoting the evidence.

*Geo. Tucker Bispham, John Hampton Barnes* with him, for appellant.—Although there may be a prima facie presumption of seaworthiness and the burden of proof is upon the insurer to prove the contrary, yet where it appears from the undisputed evidence in the case that the vessel sprung a leak or became damaged under circumstances which would not cause such results to an ordinary seaworthy vessel, the burden of proof is placed upon the vessel-owners to show that she was seaworthy : 1 Parsons on Marine Insurance, 367 ; Prescott v. Ins. Co., 1 Wharton, 399 ; Dupont v. Vance, 19 Howard, 162 ; Paddock v. Ins. Co., 11 Pick. 237 ; Miller v. Ins. Co., 2 McCord, 336 ; The Gulnare, 42 Fed. R. 861 ; Watson v. Ins. Co., 2 W. C. C.

R. 480: Coles v. Ins. Co., 3 W. C. C. R. 159; Deshon v. Ins. Co., 11 Metc. 207.

*Alfred Driver, B. F. Gilkeson* and *J. Warren Coulston* with him, for appellees, cited: R. R. v. Broadnax, 109 Pa. 440; Myers v. Girard Ins. Co., 26 Pa. 195; Steimetz v. U. S. Ins. Co., 2 S. & R. 292; Armroyal v. Union Ins. Co., 2 Bin. 394.

OPINION BY MR. CHIEF JUSTICE STERRETT, Oct. 2, 1893:

This action of foreign attachment was brought on defendant company's general average agreement of May 1, 1880, which has been sent up with the record.

It is unnecessary to state the circumstances which led to the execution of that agreement, etc.   They will be found in report of the case when it was here on writ of error in 1885: 109 Pa. 432.   On the last trial, the agreement given in evidence was followed by satisfactory proof of the adjustment and apportionment of general average, etc.   Under the evidence that was introduced, the case turned upon the questions concisely stated by the learned president of the common pleas in the closing paragraph of his clear and comprehensive charge, wherein,—after having fully explained the principles of law applicable to such cases,—he said to the jury: " You will see from what I have said that the whole case turns upon the question whether this was a proper case for a general average to be made, and whether it was a case in which the expenses of these repairs to the ship ought properly to be charged upon all the parties in interest, ship, cargo and freight, or whether it is not a case for general average.   That question depends upon the single central question of all, whether this vessel was seaworthy, in the sense in which I have defined a seaworthy vessel, when she left the port of Philadelphia."

The verdict for plaintiffs necessarily implies a finding of that central fact in their favor, and unless there is manifest error in the charge or rulings of the court the judgment entered on the verdict should not be disturbed.   If the verdict was contrary to or against the weight of the evidence, the proper place for correction of such error was in the court below.   It was assailed there but without success.   The first six specifications charge error in the learned judge's answers to defendant's 4th

to 9th points, inclusive, recited therein respectively. An examination of these points and answers, in connection with the evidence relating thereto, has failed to convince us that there is any error in either of said answers. We are fortified in this conclusion by what appears in other portions of the charge, etc. In his answers, substantially affirming defendant's first three points, the learned judge instructed the jury:

(1) If the loss,—to recover contribution for which the present action was brought,—was occasioned by the unseaworthiness of the schooner "Mattie A. Hand," existing when she commenced her voyage, there is no liability on the part of defendant to contribute to such loss; and the verdict should be for defendant.

(2) The defendant is not answerable for any expenses incurred by reason of the leaky and unsound condition of the schooner, if such leaky and unsound condition existed at the beginning of the voyage and was not occasioned by the perils of the sea, as previously explained.

(3) If the jury believe that said expenses were occasioned by the unseaworthy condition of the vessel and that said unseaworthy condition existed at the beginning of the voyage, the verdict should be for the defendant.

These instructions, given, as requested by defendant,—and of course not excepted to,—are not only accurate but they cover the controlling questions presented by the evidence.

The six specifications, above referred to, were grouped together and discussed by the learned counsel for defendant under the following proposition: " Although there may be a prima facie presumption of seaworthiness, and the burden upon the defendant to prove the contrary, yet where it appears from the undisputed evidence in the case that the vessel sprung a leak or became damaged under circumstances which would not cause such results to an ordinary seaworthy vessel, the burden of proof is placed upon the vessel owners to show that she was seaworthy."

Notwithstanding the ability with which this proposition was pressed, we think its cardinal vice consists in assuming, as an established fact, that which the testimony does not warrant, viz.: that the undisputed evidence shows " the vessel sprung a leak or became damaged under circumstances which would not

cause such results to an ordinary seaworthy vessel." On the contrary, there is testimony tending to show that the leak, etc., resulted from a peril or perils of the sea encountered on the voyage and not from pre-existing unseaworthiness. That testimony was clearly for the exclusive consideration of the jury, and was submitted to them by the learned judge under proper instructions. In addition to his affirmance of defendant's first three points, above referred to, he further instructed the jury, in his answer to plaintiffs' first point, that, " under the pleadings and issues joined in this case, the burden of proving unseaworthiness is on the party affirming it, that is, on the defendant. I must add to this that, if it is shown that shortly after the commencement of the voyage a vessel, without encountering any stress of weather or any unusual perils of the sea, becomes so leaky as to be obliged to put into a port of refuge for repairs, the presumption then is that she was unseaworthy when she sailed, and the burden of proving the contrary is then on the plaintiffs."

This instruction is in full accord with the established law as recognized by this court in Myers v. Girard Insurance Co., 26 Pa. 195, wherein it is said: "Seaworthiness is a question of fact to be determined by the jury. The presumption is in favor of seaworthiness of the vessel, and the burden is on the party alleging the absence of it. This presumption, however, may be rebutted, and the onus probandi shifted by satisfactory evidence that the vessel is unable to make the voyage, where such inability does not arise from the character of the weather or from any known cause sufficient to account for the failure, other than the condition of the vessel at the time when the voyage was attempted."

Without attempting to review the testimony in this connection, we think, as the result of our examination of it, that it falls far short of furnishing the *satisfactory* evidence that is required to shift the onus probandi. Upon the whole testimony, the question of seaworthiness of the vessel when she left the port of Philadelphia was clearly for the jury, and neither of the first six specifications is sustained.

The answer of Mr. Jarvis, complained of in the seventh specification, was not given in response to the question therein recited. As shown by the record, the question answered by him

was : " Do you know whether she had a classification of seven years at the time she was built and classed A No. 1 ? " This question was not improper. It might have been so answered as to throw some light upon the history of the vessel and her condition when she sailed ; but the witness was unable to say that the seven years, specified in the certificate of classification, etc., had not expired at that time. As it was, the testimony was of very little, if any, value to plaintiffs, and could not have been prejudicial to defendant.

The eighth and ninth specifications are not according to rule ; but, waiving that, we think there was no error in admitting the certificate of classification referred to in the former, or in receiving the answers of the witness, given in response to the question recited in the latter.

The last specification of error is : " The admission of the testimony of Charles A. Pettit, on page 140, as follows :

" Q. In consequence of what took place between you and Mr. Sherrerd, did Captain Monroe inspect this ship ?

" A. He came to me and reported that he had been on board the ' Mattie A. Hand,' and surveyed her, and she was seaworthy, and he would soon report to Mr. Sherrerd, and on the strength of that report I chartered the vessel."

As thus presented, the objection appears to be to the answer of the witness and not to the question propounded to him ; but the record shows that the question alone was excepted to, and that was done under the following circumstances. The witness had just testified, in substance, that he knew Captain Monroe, then deceased ; that he saw him in relation to the inspection and examination of the vessel, early in 1890 or late in 1889, about the time the cargo was loaded ; that he, witness, then represented the vessel, and had been applied to for a charter by Mr. Dilkes who then represented the shippers of the cargo, etc. He was then asked : " Q. What did you then do ? Did you offer him the vessel at a price ? " (" Objected to as irrelevant.")

" The Court : If he knows the fact he may state that in consequence of what took place between him and Captain Monroe, Captain Monroe inspected this ship."

Then followed the question recited in the tenth specification of error, viz. : " In consequence of what took place between you

and Mr. Sherrerd, did Captain Monroe inspect this ship?" This question was "objected to, objection overruled, and exception for defendant." Then followed the answer recited in the above quoted specification.

It will be observed that this answer is not responsive to the question that was put and excepted to. That question contemplated nothing more than an affirmative or a negative answer thereto. If the witness had answered affirmatively, his testimony would have tended to prove merely that the vessel was inspected by Captain Monroe shortly before she left the port of Philadelphia, a fact to which plaintiffs were entitled, and one that is admitted to be correct by defendant in its history of the case. Instead of directly answering the question, as propounded to him, the witness proceeded to state what Captain Monroe had told him and what he did in consequence thereof. No objection was made to the answer on the ground that it was not responsive to the question, nor that it was mere hearsay; nor was the court asked to strike out the testimony on either of these grounds, or for any other reason. The irresponsive answer was permitted to go unchallenged and it remained in the case as part of the testimony. We think it is now too late to object to it as incompetent. When a witness volunteers testimony that is either irrelevant or incompetent, the proper practice is to move the court to strike it out, and if the court refuses to do so, take an exception. In that way the matter is fairly brought upon the record for review. If that course is not pursued, the right to objection and exception must be regarded as waived, just as in all other cases where irrelevant or incompetent testimony is introduced and permitted to remain without objection and exception.

This case appears to have been tried with great care and ability, on the part of both counsel and court; and we find nothing in either of the specifications of error that requires a reversal of the judgment. It hinged on the question of fact whether the vessel was seaworthy when she left the port of Philadelphia. That question was fairly submitted to the jury and has been definitely settled by their verdict in favor of the plaintiffs.

Judgment affirmed.